Good morning, your honors. I'm here to move the admission of the law clerks and staff attorneys to the Court of Appeals and if they could come up and line up behind me. And we'll do this alphabetically and I've asked them all to step forward so you'll know who's who. Shereen Olenzada got her undergraduate degree from Georgetown and her law school degree from the University of Pennsylvania and is a law clerk to Judge Williams. Anthony Belkiston got his undergraduate degree from the University of Toronto and his law degree is from Harvard and he's admitted to practice in Illinois and he's a law clerk to Judge Williams. Matthew Conley received his undergraduate degree from Loyola and his law school degree is from Washington University. He's admitted to practice in Illinois and he's a clerk for Judge Bauer. Ian Fisher is a staff law clerk who got his undergraduate degree from Washington University. His law school degree is from Columbia and he's admitted to practice in Colorado. Grant Gardner received his undergraduate degree from Calvin College. His law school degree is from the University of Wisconsin. He's admitted to practice in the state of Wisconsin and he's a staff law clerk. Andrew Guy, who is a clerk for Judge Ripple, got his undergraduate degree from Dickinson College. His law school degree is from the University of Michigan and he's admitted to practice in the state of Pennsylvania. Sarah Hallbeck received her undergraduate degree from DePaul. Her law school degree is from Northwestern. She's admitted to practice in the state of Illinois and she is a staff law clerk. Elyse Henderson received her undergraduate degree from the University of California. Her law school degree is from Washington University. She's admitted to practice in the state of California and she's a staff law clerk. Sarah Hogarth received her undergraduate degree from Michigan State University. Her law school degree is from Notre Dame. She's admitted to practice in the state of Indiana and she's a law clerk for Judge Kaney. Elizabeth Holman received her undergraduate degree from the Catholic University. She received her law school degree from the University of Michigan. She's admitted to practice in the state of Virginia and she's a staff law clerk. Rachel Homer is a law clerk for the Chief. She received her undergraduate degree from Yale. Her law school degree is from Harvard and she's admitted to practice in the state of Massachusetts. Charles Jones received both his undergraduate and his law school degrees from Vanderbilt. He's admitted to practice in the state of Alabama and he's a law clerk for Judge Hamilton. Kendra Key received her undergraduate degree from the University of Alabama. Law school degree from Vanderbilt. Admitted to practice in the state of Alabama and is a law clerk to Judge Hamilton. Kevin Leroy received an undergraduate degree from Franciscan University. Law school degree is from Indiana. Admitted to practice in the state of Indiana and is a law clerk to Judge Sykes. Monica Mark is a law clerk to Judge Hamilton. She received her undergraduate degree from Yale. Her law school degree is from the University of Wisconsin and she's admitted to practice in the state of Wisconsin. Anne Louise Natal is a law clerk to Judge Sykes who received both her undergraduate and her law school degrees from Marquette and is admitted to practice in the state of Wisconsin. Andrew Murphy is a staff law clerk who received his undergraduate degree from the University of Texas. His law school degree is from Indiana and he's admitted to practice in the state of Texas. Benjamin O'Connor is a law clerk to Judge Bauer who received his undergraduate degree from Notre Dame. His law school degree is from John Marshall and he's admitted to practice in the state of Illinois. Samantha Reed is a staff law clerk who received her undergraduate degree from Northwestern. Her law school was the University of California and she's admitted to practice in the state of Illinois. Thomas Rabacek received his undergraduate degree from the University of Illinois. His law school degree is from the University of Wisconsin and he's admitted to practice in the state of Illinois. Julia Schwartz is a law clerk to Judge Posner, received her undergraduate degree from Princeton. Her law school degree is from the University of Chicago. She's admitted to practice in the state of Illinois. Dorothy Shapiro received her undergraduate degree from Pomona College. Her law school degree is from Harvard. She's admitted to practice in the state of New York and she's a law clerk to Judge Ruta. It's a staff law clerk who received his undergraduate degree from Beloit. Law school degree is from Northwestern and is admitted to practice in the state of Minnesota. Sarah Wheaton is a staff law clerk who attended Notre Dame for undergraduate and Harvard for law school and is admitted to practice in the state of Illinois. Your honors, I move the admission of all these fine attorneys to the court. We will second those hopes and it's my great pleasure to grant this motion to admit all of you. We look forward to seeing you frequently in this court and we appreciate the service that you've given to the court thus far. I think you can now turn around if you want to. Thank you, your honors. You've done what's fair and you will redeem yourself as attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States. Congratulations. We are here this morning to hear oral argument in the case of Tyrone Pettys against Emmett Carter and others. And we're now ready to proceed with that argument. Mr. Pickering. Thank you, your honors. Good morning. May it please the court. My name is Rami Pickering and I represent Tyrone Pettys, who is the appellant in this case. Mr. Pettys ruptured his left Achilles tendon completely at Stateville Prison in January of 2012. Today, this appeal turns chiefly on one issue, which is whether a jury could reasonably infer, based on the available records, that Tyrone Pettys was injured, that Mr. Pettys' treating physicians at Stateville, Dr. Carter and Dr. Obasi, knew of a substantial risk of harm to Mr. Pettys and disregarded that risk. On the record below, summary judgment was improper for three chief reasons. First, Dr. Carter inexplicably failed to splint Mr. Pettys' injured ankle. And that was a treatment that was simple, it was inexpensive, and it was called for by the Wexford treatment protocol that Dr. Carter implemented as the medical director of Stateville. And every treating physician in this case, including Dr. Carter, agreed that splinting or immobilization was the appropriate treatment for this type of injury. Can I ask you of what importance you think it is that it was inexpensive? I think it goes to the weighing of interest in terms of whether or not, the fact that this isn't the case where there was a difficult treatment and there was a judgment call to be made about whether or not this treatment should be provided. It also goes to the fact that Dr. Carter didn't make a judgment call, a medical judgment, in deciding to provide this treatment. There's certainly no evidence of that in the record, but there's no argument that can be made that this treatment was difficult to provide and that in the weighing of harms and benefits for that reason, he might have deferred providing immobilization and instead provided some other treatment. Immobilization provides a unique function of keeping the ankle in one place to promote healing, and that's what Dr. Kupala testified to the outside physician. And that simply wasn't provided here, and there was no other means of promoting that sort of immobilization and healing stability for the ankle. The difficulty in these cases is distinguishing between a negligent omission and conscious disregard of a known risk, or what is essentially criminal recklessness, which is the standard for deliberate indifference. And we have many of these cases where there is a course of treatment that's provided, a substantial course of treatment that's provided by the medical professional in the prison, but perhaps not complete treatment or certain components of the treatment protocol are omitted. This kind of case reaches us regularly, and the difficulty is in making that distinction when the evidence perhaps is an exploit. So how do we make that distinction, and what kind of instructions can we give to the lower courts on how that distinction is to be made out of a judgment? I think Judge Sykes, the touchstone point should be what the physician knew. And because this case is about the subjective element of the test only, we're talking about whether the physician knew of a substantial risk of harm and disregarded that risk. I have two parts to the subjective inquiry. One is the objective inquiry in this case, and everybody agrees that this is an objectively serious medical need. The two parts of the subjective inquiry are the known risk, and that, it seems to me, is conceded here. I think everybody knew, both of the doctors in this case, knew that this was subjectively a torn or likely torn Achilles tendon. Dr. Lubezki knew later, because it had been diagnosed. He didn't come into it until later, but Dr. Carter noted a probable torn Achilles tendon. It's the second part of that inquiry, not that he knew, but whether he consciously disregarded a risk associated with the failure to immobilize. Right, and so there's two aspects of knowledge there. There's the knowing the injury itself and knowing the risks of that injury. And then there's knowing the appropriate course of treatment and what's required to prevent harm to the patient. And there are different types of evidence you might proffer circumstantially as well as directly. Obviously, direct proof is quite hard to come by in these types of cases where you have an admission that I knew the right thing and I didn't do it. But you could have evidence that the physician knew what was necessary to prevent the injury, which here would be significant pain and injury healing. There's a difference between necessary and appropriate. But the physicians here agreed that healing would be hindered without keeping the ankle in one place. So Dr. Pupala, who was the outside physician, testified that because the ankle wasn't immobilized for that six-week period, there were two types of harm. There was the increased pain from the ankle's mobility that resulted in the tendon edges that would normally be sort of pressed together, pulling apart and prevented from healing because the scar tissue there would be continually disrupted. So that's the pain aspect of it, and it's also the delayed healing aspect of it. And Dr. Carter, or Dr. Pupala, wasn't the only person who knew this. Dr. Carter, who was the actual defendant in the case, testified at length that he knew the importance of immobilization. And I think if you build that- That was the protocol at Wexford, right, for that kind of treatment? That's another component of the knowledge inquiry. Judge Williams, yes, there was a protocol that Wexford administered. It's at Record 82. It's part of a set of medical policies and procedures that Wexford implements. The policy makes clear that there are practices that our physicians are meant to incorporate into their daily practice, that they're meant to set a uniform standard of care, and the protocol had a specific set of orthopedic surgery guidelines that did call for a splint as well as crutches. And so those two types of treatments provide two different modalities and two necessary modalities for both keeping the ankle non-weight-bearing and keeping the ankle immobile so that the tendon can heal. So we think that that protocol provides circumstantial evidence of knowledge because Dr. Carter was the medical director. He knew he was charged with implementing the protocol. He knew that he had a role in developing policies and procedures for the prison. But it's not just the protocol. What does the record evidence say about how well controlled Mr. King's pain was with the painkillers that Dr. Carter prescribed? Well, what we have in the period from January to March is he's receiving painkillers, Judge Robner, as you said, and he's being noted in the record as saying things like, my ankle is killing me. It's hurting me a great deal. And he's receiving strong painkillers, but he's continually stating in records between January and February that the pain control isn't sufficient. And when he was seen on February 14th by Dr. Carter, the note indicates that he had total weakness of the left foot. There are also references, I believe, I don't know exactly the dates of the records, but in that January to March period that the pain control wasn't complete. So he was suffering in that period. And we have his declaration as well that recalls the fact that he was suffering in that period, and that even today, even up until when he filed his declaration in March of 2012, he was suffering severe pain and stiffness and soreness in that tendon. And how does his testimony about his pain figure into a determination about whether summary judgment is proper? Well, I think this Court has said in cases like Jones v. Sinek, and that's actually 1983 cases, that a plaintiff's sworn testimony is testimony that can defeat summary judgment. It's not the only evidence that we have of pain and suffering, but it goes to the fact that Mr. Petty suffered harm as a result of what happened in this case. And so we also have that testimony, but more than that, we have verifying medical evidence in the record in the form of what Dr. Kupala called us in both his treatment notes and in his deposition about the fact that there was pain as well as hindered healing as a result of the failure to immobilize. But didn't he also testify that using crutches without immobilization for this brief interim period was not unreasonable? He testified that Dr. Kupala testified that using crutches without immobilization might lead to healing of the tendon regardless. Now, there was conflicting testimony on the other side of that. There was Dr. Schnell's testimony at UIC who said that it was not very likely that the tendon could heal. But more importantly, Dr. Kupala did not concede that pain and hindered healing would not result if he didn't use the boot. So even if the tendon could heal at some point, excuse me, even if the tendon might heal at some point, that wouldn't mean that there wasn't going to be in that interim meeting period unnecessary pain as a result of not immobilizing as well as a hindered healing process. And I think, yeah. Does the record indicate without reasonable dispute that Dr. Carter made a medical judgment about this course of treatment? No. Not to immobilize the ankle? It does not, Judge Hamilton. I think that's actually an important point in favor of the appellant in this case because there's no evidence that Dr. Carter sat down and weighed the options on whether to immobilize the ankle. I thought at one point in his deposition he had indicated he thought this was the better course of treatment, but there was conflicting evidence from his own deposition. There's conflicting evidence. And so it's not beyond reasonable dispute is what we would posit. So Dr. Carter said during his deposition during litigation that he believed that the crutches were an effective treatment course. He also said during that deposition that he had no recollection whatsoever of whether he had considered whether to immobilize the ankle or not. And so I think a reasonable inference that could be drawn from that and could be drawn by a jury might be that Dr. Carter didn't consider it and that the treatment plan adequacy position that he came up with later was one of reflection. And we have a similar issue going on with Dr. Obasi, who I'll get to a little bit later, but who made a similar argument about physical therapy and the fact that Mr. Pettis could have self-exercised his tendon. That wasn't discussed with Mr. Pettis. It wasn't part of Dr. Obasi's consideration at the time according to the medical records. And Dr. Obasi conceded that he didn't even know at the time whether Mr. Pettis had received physical therapy previously. So going back to Dr. Carter for a moment, I think one point that's instructive, not just the treatment protocol, although that is important, I think it's what Dr. Carter himself knew. And one thing that he brought up in his deposition was a detailed explanation of why it's important to immobilize an Achilles tendon rupture. And he was asked why is immobilization required for proper healing of the tendon. And I'd just like to read the quote from what he said because I think it's instructive. He said, because in the process of healing, in all degrees of tear and injury, there is an acute phase of healing and then there is a more chronic phase of healing. So in the acute phase of healing, you are generating an immune system response in the body. It's reaching the area, it's working on the area, and you don't want anything to disrupt that process. I think that maps on very cleanly to what Dr. Kupala told us in his deposition about how an Achilles tendon rupture heals. When the tendon is ruptured, you can picture it sort of pulls apart and there are two split ends. And immobilization pushes those ends together because the foot is put into flexion where the toe is pointed downward and the tendon is brought together. And so when you don't have an immobilization that brings those tendon edges together to enable that response that Dr. Carter was talking about, that almost immune-like response to treat the area, you're going to keep disrupting the healing process. And as you might imagine, that's going to create a lot of pain. So Dr. Carter did understand this when he was pressed to talk about the physiological mechanism of why immobilization was important. He was able to talk about that and articulate the medical basis for it. Excuse me, is the pain enough? What I'm trying to do is take this back to basics, essentially. We have a sell-against gamble, we have farmer-against-brand, and we have cases that say once you've got the objective of a farm to satisfy, which we do, you're essentially looking for something that's the equivalent of a punishment. I mean, we're talking about the Eighth Amendment. And the way the Supreme Court has articulated that is deliberate indifference. So there's actually a subject as part of the deliberate, but there's some objective things that we're looking at to draw this inference of something that allows us to equate the poor quality of care that the person got. Or, you know, maybe just the indifference to pain. I don't know. It seems to me we need to nail down what is it that allows us to draw that inference, that moves this from simply the tort realm over into an Eighth Amendment kind of problem. I mean, there are a couple of things cases talk about. Cases talk about, I think they all start with poor care of some sort. But if that's not enough, sometimes there's an impermissible reason, such as, you know, we're doing this to save money. We don't care about giving the patient the right care. Sometimes the courts talk about the failure to exercise professional medical judgment at all. Sometimes there's just no care. Sometimes there's disregard of the specialist. I mean, is there any thread that links these things together? I think there are a couple of threads. One, I think, is the point you made of a failure to exercise medical judgment at all. Obviously, we've seen that in a lot of cases. In this case, it's manifested as to the point of mobilization that was critical. And there was no evidence in any of the treating records, the progress notes at the time, the deposition testimony, that immobilization was considered by Dr. Carter, rejected by Dr. Carter, because it wasn't the appropriate treatment in some respect. The record shows that there were plenty of splints around, right? The record is a bit unclear. What Dr. Carter was able to nail down was that he couldn't remember a time when there were no splints at the prison. He wasn't entirely sure which splints were available. Frankly, you know, a splint can be made very easily, and some of the physicians talked about making splints on their own in the prison. Dr. Abbasi talked about crafting it, I think he maybe said, out of, like, an ace bandage and tape and a couple of pieces of wood or that sort of thing. So there are ways to immobilize. You don't have to use the boot that a lot of us who have these injuries and are fortunate are able to get into our feet. You can have a cast, or you can just have a very simple splint, and you're going to receive varying degrees of immobilization from those tools. But to get back to your question, I think the one thread is the failure to exercise medical judgment. The other is that there are varying types of circumstantial evidence that can indicate a knowing disregard of care. I would hesitate to push that knowing point too far, because I think it's clear from the case law that you don't have to show an intent to harm, and we've never contended that this was somehow malicious. What we have to show is deliberate indifference, so a state of mind that is knowing the risks and, for whatever reason, disregarding those risks. My understanding is that he was without the ability to go to meals, to go to activities. So, in effect, when you require a person to basically live in solitary confinement, that's a form of punishment, would you? I think it could be, Judge Roebner. Here, Mr. Pettis received meals in his cell for one week, and so that was a period of time in which he wasn't ostensibly forced to go out of his cell, but nevertheless, he had to stay in his cell. But after that week, when he didn't get the meals in his cell anymore, he had to go around the prison in order to get his meals, to go to the shower, and the sorts of things that happen on a day-to-day basis in the prison. And when he did those things, he had to do them with his leg just sort of dangling while he was using crutches. And, you know, you can hold your leg in a position as best as you can, but if you move it the slightest bit, I can imagine, and I imagine we can all imagine, that that's going to hurt a great deal if you have a completely ruptured tent. Trump testified that he did. That he did, and so we have that evidence in the record. His leg wasn't tied up at all? There's no evidence of that at all, Judge Posner. So he had to actually bend his knee in order to keep the injured leg off the ground. Right, otherwise if your foot's flat on the ground, that tendon is just opened up. So he would have had to keep that leg up every time he was standing, and any time he was walking as well. So to go back to the circumstantial evidence point, and as Judge Williams mentioned earlier, the treatment protocol that Wexford has, you know, I certainly concede that it's not a mandatory protocol. The protocol makes clear that physicians do have medical judgment that they can exercise. It wasn't exercised here, but they do have that judgment to exercise. But the protocol can provide circumstantial evidence. Obasi, is that how you pronounce it? Obasi is how I pronounce it, yes. Is he an orthopedic doctor? He's not. Neither Dr. Carter nor Dr. Obasi are orthopedic surgeons. Dr. Obasi actually testified, his deposition is at 86-2 in the record. He testified that he could not recall ever diagnosing or treating an Achilles tendon rupture other than this case. Dr. Carter testified that maybe he had treated less than 10 in his entire career. For about 20 years? For Dr. Carter? For Dr. Carter. Yes, I believe so. So neither of them had a specialty in this. Is there an orthopedic doctor on the medical staff? At Stateville Prison. There's not a record of that, and I don't believe that there is an orthopedic specialist. There's a physical therapist who is on staff, and that physical therapist can be consulted without the need for collegial review, which is sort of a second opinion process within the prison. But that is the most specialized person I'm aware of in the prison. What evidence is there in the record about whether Mr. Petty actually had previous physical therapy for a torn Achilles tendon on his other foot? And how long before the other right foot injury? Sure. So that injury, he ruptured his right Achilles tendon, a partial rupture rather than a complete rupture, in April of 2010. And so he received a course of treatment for that between 2010 and 2011. He did receive physical therapy for that injury. Do we know how soon after the injury? It seems to me as a total white person, maybe you let the thing heal for a while, and then you go into physical therapy to get the muscle tone back. But I don't know. I mean, is there any kind of record that shows how physical therapy fits into the healing process? I believe the physicians talked about it as a strengthening and conditioning exercise. So when you rupture a tendon, understandably you're not using that leg very much, and there can be atrophy of the muscle. I don't know that in the record this is made explicit, but I believe that there are allusions to the fact that physical therapy is a sort of rehab treatment that comes once the tendon is healing. Does the patient know when to start? When to start physical therapy? He can't make that judgment. When it's too and when they're pushing it too hard. He needs the instruction of a therapist for that, Judge Hamilton. I think that's a key point here because that just goes to show how self-exercise or walking around the sorts of alternative treatments that the athletes have tried to say would have substituted here really aren't adequate because physical therapy is a prescription treatment. It's provided by a specialized therapist in the prison, and that's what Dr. Schmelt ordered. That's what he made clear in his deposition that he expected to occur, that a physical therapist would first teach the exercises to Mr. Pettis, and that eventually Mr. Pettis would learn to provide the exercises on his own. But Mr. Pettis, granted, had received therapy for a prior partial rupture. He had never experienced a complete rupture of the Achilles tendon until 2012, and he had no way to know whether those previous exercises might have been too much of a strain for a rupture of the type he had later because he never saw a therapist who could give him that advice. And so I think that's a key point that shows that the sort of post hoc rationalizations we saw for Dr. Abbasi's treatment don't hold water when you put them to the fire. Counsel, I would just suggest there's pretty strong evidence here that would allow a jury to infer negligence at least and to go back to questions that were asked earlier about how we distinguish between negligence and deliberate indifference for purposes of the constitutional claim. Some of the opinions talk about blatant failures, obvious failures, clear failures, et cetera. Is that kind of evidence helpful? Is there a formula you would suggest we use? Is the degree of the apparent failure to provide appropriate care a relevant factor? Well, I think the court has said that there has to be a substantial departure from the appropriate standard of care. That's one element that has already been articulated. I think in this case there's a line of sufficiency that is easily crossed, and it has to do with what the physicians themselves knew about the appropriate treatment. And I think that that's a helpful touchstone because it's something that's rooted in the record. It's something that a district judge can look to objectively. In this context, an empty head is a defense, but we have pretty good evidence here that these physicians actually were aware. I think we do. The physicians pleaded ignorance to some extent, but there's nothing to back up that ignorance in the record. So you might expect if there was this medical judgment, for example, about immobilization, that he thought the crutches were effective and that immobilization can be important, as he conceded, but in this case it wasn't required, you might think that that would be reflected somewhere in the treatment notes, that we decided not to put a cast on this or a crutch or a boot or a splint because there was a reason for that. And in the absence of that evidence, I think that at the very least, at this procedural posture, there is an inference that can be drawn reasonably by a jury that there was no exercise of medical judgment. And to the physical therapy, Dr. Obasi gave conflicting testimony in his deposition as to why that wasn't implemented. He did, Judge Williamson. I see that I'm into my rebuttal time. I'll finish the question. He certainly gave conflicting testimony that self-exercise could have occurred, but he also conceded that he had no recollection of discussing physical therapy. He had no recollection of whether physical therapy had been conducted on the prior injury, and yet he admitted that it was common sense to provide physical therapy for this type of injury. So I think that at the very least, there are competing inferences to be drawn, and I'll reserve the remainder of my time. Thank you. All right. Thank you very much. Mr. Carson. Thank you. Good morning, Justice's counsel. Judges. Judges. Thank you. May it please the Court. I think the logical starting point is one that's been touched upon by a couple of the judges here, which is the standard has to be applied. Nobody is arguing that this was the best possible care that could have been provided to this inmate. Well, why didn't they have him examined by an orthopedist? He was examined by an orthopedist. Who's that? Dr. Prapala. Pardon? Dr. Prapala. No, a couple of months later. It was. A timing question. But when we look at the timing question, and this is where I think the distinction can clearly be made. Well, the YC and Carter, they're not orthopedists. True. And they give really incoherent testimony. So why didn't they have him examined by an orthopedist? Well, again, they did. Instead of using their own muddled judgment. This particular patient was seen multiple times by an orthopedist before Dr. Obeisi ever was involved in the care. I think what Judge Posner is asking is that this is a January 2012 injury. And Dr. Carter himself, when he sees Mr. Petty's, orders the MRI, orders an examination by an orthopedist and says it's urgent. Why does he not see an orthopedist until March, two months later, when the man is constantly testifying that he's in severe pain? That's the problem. It's the gap. And the gap could lead to two problems. Of course, there's the existing problem of the pain, which our patients say is already an issue. And secondly, what's the effect on the healing process of the delay? There's some testimony in the record about that. And I appreciate all that. The point I was going to make was that if one considers what Dr. Carter did here, and it's a clear distinction from all the cases that have been cited, including the cases that were cited in the petition for rehearing, the very day of the injury, Mr. Petty's was seen by a doctor at the facility, a doctor who did not, by the way, order immobilization. Dr. Carter also saw the patient the very same day and added the order for the MRI and added the order for the orthopedic consultation and marked it urgent. So here's the problem that I have with this. A jury might look at that and think that Dr. Carter did what he could, but it seems to me in light of the protocol for immobilization and the other testimony in the record about just the physics of the way the Achilles tendon works and when it's pulled apart there's some evidence that it was pulled apart a couple of centimeters, a jury could also see this as the senator following the protocol is actually deliberate indifference. He knows about it. He just doesn't do anything. He gives them crutches that they could even exaggerate the problem. So, I mean, I would in a minute think that, you know, he's entitled to do that for himself as a matter of law, but why don't we just have the students act? Well, because, again, it's important to look at the standard and the role that the court plays. That's right. Look at the standard of what I call deliberate indifference. Right. And the role that the court plays in taking cases of this type out of the hands of the jury when the jury might look at this and say, they were negligent, I'm going to find against the document. I don't think juries disregard instructions. The jury would be instructed that mere negligence doesn't do it. There has to be an inference that goes all the way to deliberate indifference, such as, I knew the protocol, I just didn't bother to do anything, and besides, I was worried about how expensive it would be. Something like that could probably show deliberate indifference. If those were the factors at play here, and if we were considering in isolation, the sole issue here being whether or not a splint was ordered. But that's not what occurred here. There was extensive treatment that was provided. What do you call ineffective? I mean, are we really at a point where we can't explore the reason why it was ineffective? Ineffective because the person is just sloppy or negligent or ineffective because he just didn't care. He was just being deliberately indifferent. Certainly those things can be explored in the appropriate context. But when we're talking about a splint and the primary issue being there was pain there, in the context of a physician who ordered an ortho consult, an MRI the very day of the injury, and who provided pain medications and several other modalities designed specifically to minimize pain. You've emphasized and understandably the order for an MRI the day of the injury marked urgent. Yes. Because I understand there's a difference between emergent and urgent in medical care. But I have trouble understanding how an urgent order that is being given any intention could take two months to execute. Well, the record shows that it was actually scheduled for a week or so later, and then there was a prison lockdown that prevented it. I understand that. But it's an urgent order by the medical director of the facility, who surely has the authority to order that off-site diagnosis, correct? He does not. He cannot. When the prison is open, the only thing that the doctor can do would be to declare a medical emergency and send him to the emergency room where one could only hope that the emergency room, first of all, wouldn't be treating him orthopedically anyway. And in a circumstance like that. Well, he wasn't there, but he was getting treated. Yes, but the doctor can override the lockdown and send him to the emergency room. And he didn't. And we assume that the emergency room has an orthopedist, and they can get an orthopedist there to know what's going on. And am I incorrect if I believe there were only two days of lockdown between January 16th and March 6th when he had the MRI? I don't believe that's correct. There were multiple episodes of lockdown and security issues. In fact, the medical records referenced some evaluations that were to be done that had to be canceled due to security issues at the facility. And the issue, I think, comes down to can or should, or is it deliberate indifference for a doctor who has ordered a consult and is told by the security personnel at the facility that we're not letting anybody out right now due to a lockdown. In a case not involving a heart attack, not involving true medical emergencies, he should use that power to override that where the patient is already at. What you have is, on the record that we have in force, is a patient in very serious pain with an urgent need for diagnosis and treatment. And the deliberate failure to respond to ongoing serious pain is something that we and other courts have repeatedly treated as deliberate indifference. I understand it's not a heart attack in the minutes matter, but surely days do in this situation. Well, and again, if this was an issue where... This is the testimony of these doctors about both the pain and the gapping and the delayed healing. With respect to the pain, again, there's no evidence in this record of deliberate indifference to pain. There can certainly be a question as to whether... They gave him pills and ice, but... And they're not addressing the root of the problem, which is that his leg, his foot is flopping around, right? Well, there's no... So there's evidence. If I take it, you're saying to us, maybe this is true, that the policy of the state jail prison is that no matter how much pain somebody's in, if it's not a heart attack or a stroke or something like that, that's going to kill somebody in the next hour, that it's okay to wait a couple of months to get them to a doctor or a hospital for urgent care. So the pain is fine under the state's policies. If it testifies that there's pain, I don't know how on summary judgment we can assume he wasn't in pain. And I don't know of any circumstance where somebody who suffers a ruptured Achilles tendon wouldn't be in some pain, regardless of the treatment that they received. He said he's in severe pain. And as I say, it's summary judgment. I don't know how we can say, well, actually, he wasn't really in severe pain. Nobody's cross-examined him if we haven't had that kind of process. And so I think in answer to Judge Hamilton's question, you were saying that pain alone is not enough to override a lockdown order and send somebody to a hospital. I would think that's true. And that's the pain. That sounds like a deliberate violation of the Eighth Amendment under that policy to me, frankly. Well, I would say a couple of things. First of all, the state-filled penitentiary is not the defendant in the case. The doctor is. The doctor issued the appropriate orders. Well, that depends on whether these physicians could override the lockdown, could order him sent to the orthopedic consultation. Did they have that power in Illinois? Only in declaring a medical emergency and sending the patient to the emergency room. So they couldn't. In that specific minute. They didn't. Well, and to clarify, because there are two separate issues here.  Perhaps you would tell us who the right defendant is. Well, someone could theoretically have sued the state for its lockdown policy. You can't sue the state. You have to sue the people. Right. Named persons. Who should he have sued instead of these two physicians? The director of corrections at the facility? No, it's not the director of the Department of Corrections. He's not personally responsible for this. I'm talking about the director of that facility. Right. The correctional office officials, when in these kinds of cases, always say to defend themselves, we would do what the doctors tell us to do. Right. I've seen cases where they do that in certain cases. All the time. And I'm talking about specific interaction with the patient as opposed to the lockdown policy. But maybe you've seen that. I haven't. But I certainly can't contest what you've seen here on the bench. You've certainly seen more of these cases than I have. I do agree that there's an override of somebody's willingness to call something an emergency. And essentially an emergency means it has to be handled now. It can't be handled a week from now or two months from now or something. So there's at least that much authority in the medical director, which Dr. Carter was during this initial period. Right. That is true. And I think that's a power that should be used judiciously. It's an emergency situation. But you don't think pain could ever constitute an emergency. I haven't said that it could never constitute an emergency. I think ankle pain that's receiving treatment is not a medical problem. It's receiving by hypothesis ineffective treatment. He is testifying that the treatment, the crutches and the painkillers aren't doing the job. That would be an issue of medical judgment whether or not that was even negligence. He says they're not doing the job. Maybe, I don't know, maybe Dr. Carter says you just have to live with the pain. There's nothing that can be done about it. Maybe Dr. Carter doesn't believe he's in that much pain. I don't know. But he says he is. Again, back to the- In summary, doesn't. So don't have to take the facts favorably to him. I think we have to look at the totality of the facts. Well, the totality is sufficient enough to get past summary judgment where Carter refused to follow the protocol at Wexford that required immobilizing and killing tendon injuries. He admitted that immobilization was the proper treatment. First of all, I respectfully disagree that the protocols require anything. The recommendations to physicians and Dr. Carter testified about using medical judgment. In his opinion- Well, how could he use medical judgment when he's not an orthopedist? He's still a physician. Yeah, I know. But medical, it's an extremely complex field of medicine. And the fact that you're a doctor doesn't mean you can treat and have an opinion on every possible medical misfortune that people experience, right? I agree with you. You don't know anything about orthopedic medicine. Why don't you refer him to someone who does? Well, A, he did, and B, that also speaks to the issue of whether or not this would be considered negligence versus deliberate indifference. Let me get back to this lockdown situation. So he knows it's a lockdown. He can't send him out. He says it's urgent. Wouldn't you think that a doctor would go back, he's not an orthopedic guy, and look this up, look at the protocol again, and say, well, is there something more I can do since it's on lockdown? Maybe I should put the splint on. He rightly, those are things that he could do. And shouldn't that be something a jury can consider on summary judgment? In determining deliberate indifference? I don't think so. I think if one could argue that it was negligent for him not to have followed up, that's an argument that could be made. But this is a higher standard. From your perspective, it is a higher standard, but from your perspective, what kind of evidence short of a direct admission would be sufficient to allow the case to go to the jury? What would it take? I would think if there was actual evidence that the complaints were being ignored or not treated, complete failure to treat. Those are the easy cases. Right. But what we deal with, and the reason we're here in this case, in my view at least, is because there's this category of cases where we see prison medical officials, often through private companies, sticking with ineffective, low-cost, in-house treatment for prolonged periods of time, resulting in pain and aggravation of injuries and diseases. And so the question is, do you see any, in those situations, any kind of circumstantial evidence that would let a case go to a jury, as long as they're getting some treatment? There are certainly circumstances. And I'll try, Your Honor. Here, for instance, we've talked about split. Split is not a difficult thing to order. It's not expensive. There was no just – probably the medications he was being provided were probably more expensive and more comprehensive than the split. Now, maybe it was a bad call not to give a split, but he was also given several other treatment bondalities. One is a permissible inference. One inference might be a bad call. But I just – I have trouble with the idea that you've got to exclude all inferences except the one that would be favorable to the plaintiff. I would say, as long as there is an inference that the failure to order the split was just raw indifference, deliberate indifference to the proper way of treatment. Throw some pills at him, give him some crutches, and get him out of your office. You know, sort of like give him Tylenol and tell him to go to sleep or something. That's an inference, but that is so far removed from the way that one ought to treat this that it's actually not just negligence. It's indifference. And if those were the facts here, one could certainly make that argument. Why couldn't a jury see what I've just described as a valid inference from the facts we have in this record? It's not the only inference. A jury could rule for your client. But why isn't it an inference? Well, I think there are two things, John. One has to be not just an inference, but a reasonable inference. Well, why is it unreasonable? And two, again. Why is it an unreasonable inference from what happened? Because of the totality of the circumstances. What circumstance makes this an unreasonable inference? That's just a phrase. We have the protocol from Westford. We have the fact that it's cheap. We have the fact that, according to you, any general practitioner should know how to treat a ruptured Achilles tendon. We have the fact that he was in pain. And, yes, this isn't done, ever, by Dr. Carter. There were so many other treatment modalities that were provided. Where is the evidence that any of the rest of them was an appropriate way to treat a ruptured Achilles tendon? None. Oh, I think there's clear evidence that bed rest is to get. It was Dr. Carter's opinion that the most important thing was that the patient not be weight-bearing, which is why he was initially put on bed rest, why he was given crutches, why he was instructed. Now, that may be just negligence. It's certainly negligence, if that's what he thought, given the evidence and the record from the specialist about how the tendon retracts when it's ruptured and the need to hold the two ends of the tendon together. Maybe he's just negligent to think that bed rest is okay. But why isn't he, or why couldn't a jury find him over the line of deliberate indifference by the failure to follow protocol and the just ignoring of him until some two months later, off he goes to Dr. Capallo? Well, and the record is not that the patient was ignored. He was seen several times by doctors in the facility, including Dr. Carter, between the initial visit and when he was ultimately sent for the MRI. But they never split him. True. And there's evidence in the record to show that this damaged him because it increased the gap between the two ends of the tendon. Right. Centimeters to about four centimeters. True. And I think the issue then becomes can the court, or should the court, or the jury look at one aspect of a more complex provision of care in favor? What do you make of the mentality cut from unseen? He testifies, if he did not have that, meaning physical therapy, then he healed without physical, no physical therapy. Ask a guy to walk? To have to hire somebody to hold you and walk you? Somebody educated and smart can walk on his own, but he can bend his knees, stretch them on his own. You don't need to have somebody standing by to show you how to bend your knee and stretch your knee. Does that sound like the mental process of a professional? A professional in the context of a deposition? Sounds like gibberish. In the context of a physician being accused of deliberate indifference and being somewhat defensive, I think that's a cross in that genre, and I certainly would have hoped he would phrase it better. But I don't think it is evidence of deliberate indifference. I don't know what he meant by that. We're going to change to Dr. Robocci because it certainly entirely, I accept the idea that at some point during the healing process of a torn Achilles tendon, physical therapy plays an important role. That's what the experts say. But I don't see any evidence that anybody has thought about when physical therapy comes into the picture from the day of the tear through the end of time. And I don't see any evidence of what kinds of exercises are optimal for different points in that time because I could imagine that that would differ. But he's not told anything. There's kind of a life assumption that this tear is like his earlier tear. We don't even have anybody thinking about that. So when doctors do things based on no data, why doesn't that look like deliberate indifference? Well, again, during that time frame, before Dr. Obasi saw the patient, he was seen by orthopedic surgeons who were presumably evaluating non-defendant orthopedic surgeons. I'm trying to focus on Dr. Obasi and physical therapy and what kind of guidance he got, what kind of professional oversight. When were decisions made about what therapy for him in particular was correct at which point? I see nothing. I see somebody just saying the word physical therapy because that's self-defining, which it surely is not. And presumably the orthopedic surgeons who saw the patient had those discussions with the patient. It's not in the notes. It's not in the notes. It didn't happen. Dr. Chanel testified he would leave the details of the physical therapy to the physical therapist, but not to the patient. And then Dr. Obasi didn't let the physical therapist tell him. Well, he didn't prevent him from telling him. He did not order it, which is true. So the physical therapist would just act on his own without an order from the doctor. Laying out what the doctor thought needed to be done. They are actually able to do that. Like there was no request by the doctor. So let's make it lesser from an order to a request. There was no phone call. Yay, he needs physical therapy. Right? True. Well, Obasi really says you don't need physical therapy. You don't need hands to guide it. It's not a walk. Well, I think what he was getting at is Achilles tendon injury. Somebody who had been through physical therapy and who had been treated for an Achilles tendon injury, there are only a couple of exercises that are done for Achilles tendon injury. How do we know that? And how does a patient know that? And how do we know about the timing and the intensity of the exercise? In other words, when should it begin? Because sometimes when physical therapy starts too early, you can do more harm than good. But there was no real analysis done there. And no medical judgment, really. He just said no. Certainly there's a process of healing before one begins physical therapy. And my understanding was that Dr. Obasi was waiting for evaluation by the orthopedic surgeon. The orthopedic surgeon made a determination. The doctor disagreed with him as to doing the physical therapy because of presumably his understanding. You're saying Obasi disagreed with Chanel? Regarding the need for physical therapy. He made a deliberate decision. He exercised medical judgment to that effect. Is that your contention? Yes. And what's the evidence for that medical judgment at the time? That the patient came to him with having had the consult from the doctor. Presumably if the doctor thought self-exercise was an appropriate response here, he would have discussed that with the plaintiff, correct? Presumably. He would have charted it. He would have checked to see if there had, in fact, been physical therapy before, right? And none of those things happened in this record, correct? Well, we don't know all of that. Is there any evidence that conflicts with what I've just told you? Well, there are several things. Let me see if I can raise it because part of the issue is- I'll take it one at a time. Dr. Obasi didn't know if the plaintiff had actually had physical therapy for his prior ankle injury, correct? He did not remember at the time of his deposition what he knew. Okay. He did not know if the injuries were the same. Partial care versus complete rupture, different courses of treatment, is that correct? I don't remember what he knew of the specifics of the difference in the injuries. He didn't recall ever talking with Mr. Pettis about this theory of this ludicrous experiment of self-exercise, right? He did not recall the specifics of that, true. And he didn't chart it. True. So what evidence is there that would require a jury to find that Dr. Obasi actually exercised professional medical judgment in choosing this course? Would require a jury to find he exercised medical judgment? He had discretion as a physician to determine what would be appropriate. If he explained what his reasoning was, and I understand that he doesn't remember everything that had happened from the treatment of one patient to the other. You can't expect a jury. A jury would not have to agree with that. Okay. So is your bottom line that as long as a doctor keeps seeing a patient and giving them some kind of treatment, of course, with Obasi there was no treatment, but if they get some kind of treatment, that's enough to show they exercised adequate care and to see the deliberate indifference claim? Well, two things. One, Dr. Obasi did provide care. He did not provide physical therapy, but several other orders were continued. Second, adequate care. And if the treatment continues such as it was, but it's not working, that's still not enough for a deliberate indifference claim? In and of itself, no. I think if there's evidence that he knew he was causing harm to the patient and chose not to change the course, that would be one thing. If he felt the patient was getting better, and, in fact, the evidence showed the patient was getting better, maybe not quite fully to the level. When you say harm, you're not including pain. Well, the pain was being addressed. We can take issue with how it was being addressed. It wasn't affected at all. Actually, his pain, by the time he had seen Dr. Obasi, the records showed that the pain was significantly better and that he was walking better and that he was more mobile than he had been earlier. But certainly not when he was with Dr. Carter those two months. Well, that was initially after the injury. And there were all kinds of treatment modalities that were being provided. One can argue that the splints should have been added as one of those treatment modalities. Surgery and splints. True. But even with respect to surgery, by the way, the surgeon who ultimately saw the patient never recommended surgery. Much later. Within several months after the injury. Dr. Carter acknowledged awareness of the protocol, right? He was aware of the protocol, yes. The splint protocol or the boot protocol. He was aware that there was a reference in there that says, and the exact wording of the protocol, I believe, is splint, comma, crutches, and x-ray. Literally four words. Okay. The entirety of what's in there. And that's not enough from which a jury could reasonably infer subjective awareness of a risk. And is it a conscious judgment? I don't think it is. I think... Over to a countervailing evidence? Or just honest evidence? There was nothing else in the record. He offered no explanation at all. I understand he attempted an explanation. Let's take that off the table. Because the jury could discredit that explanation, right? True. So take that off the table. There were no explanations at all. If you're a physician, then that's not enough. If, again, that was... He disregarded the entirety of the treatment modality, did nothing to care for the patient. So it's not correct to focus on the omitted components of the protocol? Solely? I don't believe it is to focus solely on that issue. What was his basis not being an orthopedist and disagreeing with the lecture protocols? I think it was his experience in having treated at least some Achilles tendon ruptures that he felt immobilization by non-weight-bearing was appropriate. Immobilization, non-weight-bearing, you could wiggle your foot around all day long. If you were sitting in a chair, even, and non-weight-bearing. So those are two completely different things. And I'm not sure where he actually said, I read the protocol and I chose not to put a splint or in any other way to immobilize the foot for this reason, X. You know, it's just not said. You're guessing that that's what he thought. But we don't know, do we? He actually specifically indicated that his belief that the use of the crutches and other modalities was addressing the issue of immobilization. He clearly may have been wrong in that regard. Do you think that walking on crutches immobilizes the foot that isn't touching the ground? In the sense that he understood immobilization. Well, that would have to be right, right? Because your foot would be swinging around. He actually thinks that crutches immobilize the foot? In the context of immobilization, if he understood it. I understand what you mean in the context of immobilization. Immobilization means nothing moves, right? Immobile. Not entirely in the medical context. I think there are levels of immobilization. Weight-bearing and immobilization are simply two different contexts. They really are. Maybe he thinks they're all the same, but they are really two different contexts. I see my time is up. If you'd like to give us one final sentence, that would be fine. I would just very briefly state that, again, I think we need to look at the totality of the circumstances. And while obviously the panel has strong disagreements with the care that was provided, disagreements with the care, and even finding the care was negative is not the same as saying the doctors were deliberately indifferent in the totality of the circumstances. I would also note that there are two separate cases here, one for Dr. Carter and one for Dr. Obasi. All right. Thank you very much. Let's move on to the next group of three. Just a few moments. Your Honor. I'd like to just start by picking up on the immobilization versus weight-bearing point that was just discussed. It's true that Dr. Carter did say during his deposition, and the appellants have argued, appellees have argued, that immobilization and weight-bearing are equivalent treatments. It's not reflected anywhere in the contemporaneous medical records. That's a product of the deposition that was conducted with Dr. Carter. I was wondering, is your position that every excluded treatment, Your Honor, must be noted in a physician's record? No. In other words, there's three approaches. That's not limited to this case. There's three approaches. Choose A. You have to give reasons why you don't do B and C. Is that what you're suggesting? We have here an absence in the record of what was not considered and here did not consider? Right. And the consideration that you're talking about is the weight of reflection, if I understand it. It's like when you take the deposition, which clearly is a situation where you do reflect upon matters that you may not have spoken of specifically at the time of an incident. So you're building your case partially on that and not that this is late reflection, late judgment that never was exercised initially. I don't think you have to show that, Judge Fahm. I think that there are competing inferences that can be drawn from the absence of that evidence. Well, let's say this. Call your case gross negligence and a claim of severe pain. Would you say that always equals a defeat of summary judgment? Well, it would certainly depend on the evidence. I don't think. I think there are. Let's take the case of negligent conduct if we want to call it that by deposition. We don't have to call it inadequate. Let's call it negligent. And, again, we have a claim of severe pain, which I would suggest would probably be incurred in most cases of this sort. Right. Certainly severe pain and severe pain has been held to the check. You would argue that our inquiry should end there, right? Summary judgment could never be granted in that setting. I don't think so. I think it depends on what the evidence is in the other direction. Now, if the evidence only permits the reasonable inference that there were competing treatment protocols or treatment modalities that could be pursued and the choice was made to pursue one modality based on a medical judgment, that would be one case. I think we have competing inferences here that can be drawn from the fact that there's no contemporaneous evidence that Dr. Carter considered these facts. The way Dr. Carter was aware at the time he ordered the MRI in the first day, that he had in mind his 20 years' experience where he had 10 situations where there could be standard. He very well must have. So it's not fair to say he had that in mind. We can't conclude that. We can certainly conclude that he brought his experience to the table. I think it's a reasonable inference to conclude that he brought that experience to the table. But I also think a reasonable inference to be drawn is that as a non-orthopedic surgeon, a non-specialist, Dr. Carter didn't have an independent basis for deciding whether immobilization should or should not be utilized. But you don't even have to go that far because in the record you have evidence here that Dr. Carter knew that immobilization was the right treatment, that he knew the medical basis for why immobilization was required. But the expert said that immobilization wasn't always necessary. That's correct. The expert, Dr. Pupala, was one of the experts. He said that he would always immobilize the tendon except in a narrow set of circumstances where doing so would interfere with some other secondary condition. Say you have an open sore on your ankle that's going to be hindered from healing when you use a boot. But he did say he would always immobilize. And Dr. Schmel, the other outside expert, said that immobilization was essentially critical to healing and that it was unlikely to heal without some form of immobilization. I think Pupala said it always provides a lot of comfort being immobilized, but it doesn't have to be done. The Achilles would probably heal without it. Right. That's Dr. Pupala who said that. And then you had Dr. Schmel saying it was not very likely that the tendon healed. So, again, we have competing evidence from different orthopedic surgeons who both testified in this case and from whom reasonable inferences could be drawn in either direction. And we have a protocol, and Dr. Carter doesn't say why he excluded immobilization. That's right. That was the recommendation. That's correct, Judge Williams. Theoretically, I mean, if Carter had explained and had some medical judgment or medical reason for not going with the immobilization, it's conceivable there might have been a basis for excluding the treatment. Certainly, it's conceivable. And all we're saying here is that there are competing inferences that do not permit summary judgment in favor of the defendants. We certainly, as Judge Wood noted, we would not contend that this is a case where we are entitled to judgment as a matter of law. I would turn to the delay point that was discussed a little bit, and just to clarify a couple of points in the record, Dr. Carter did believe that he could have expedited these referrals if he wished to do so. And his deposition of page 62 of the record at 86-1, he answered, I suppose, when he was asked if he could have moved up that march outside the referral. Page 62 of 86-1. Page 62 of record 86-1. I'd like to clarify, you're not challenging the failure to override the lockdown or the failure to expedite the referrals. You're challenging the failure to immobilize by Dr. Carter and the failure to order physical therapy by Dr. Abbasi. Those are the main challenges. It's a delay claim. Well, it is a delay claim because Dr. Carter didn't immobilize the defendant at the outset, and he could have done so either in one of two ways. It's a delay claim with respect to the failure to immobilize. That's correct. Because he was, in fact, seen, had an MRI three weeks after the injury, and he saw the orthopedic four weeks after the injury and had boots on. Well, both of those happened about five, six weeks after the injury. But, yes, he received the boot at the six-week point. Yeah, it was January 19th he ruptured, March 6th that he got the MRI. And then March 15th for the boot. And March 15th when he meets with the expert for orthopedics. That's correct. And in terms of the lockdown and the issues with the lockdown, you're not challenging the lockdown, but those are certainly circumstances surrounding some of the decision-making of what was and was not done. They are, and I think it goes to his state of mind, because the importance of the lockdown is tied to the fact that he knew he could have expedited the referral by overriding the lockdown and sending Mr. Petty's out if he felt that that was necessary. I don't know that it would have been necessary here because splints were available in the prison. So if he had decided to utilize the splint right up front, Judge Sykes, then I think there wouldn't have been a problem. An alternative that was available would have been to send him out. There's no freestanding delay claim. The claim here is he should have put the boot on right away. The claim is that he should have put the boot on right away and that because he didn't do so, the delay in providing that treatment resulted in harm of two different types. That's the claim. And it's certainly part of your claim that even given the fact that they were in lockdown, that he could have also rethought the situation. Even assuming he thought he couldn't send him out, he could have rethought the situation and done more. That is absolutely part of our claim, Judge Williams. I do see my time is up. I would just very briefly note that there were two other defenses raised by the defendants, qualified immunity and exhaustion. For the reasons in our brief that I won't belabor right now, we think those defenses are inapplicable categorically and under the evidence here. So for those reasons, I would ask the court to reverse them. Thank you very much. All right. Thanks to both counsels. The court will take the case under advisement. Court will be in recess. Thank you.